IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-183

 No. COA20-534

 Filed 4 May 2021

 Gaston County, No. 18 CRS 3691, 56251, 56323, 56326, 56327; 19 CRS 5616

 STATE OF NORTH CAROLINA

 v.

 SCOTT WARREN FLOW

 Appeal by defendant from judgments entered 20 December 2019 by Judge

 Nathan H. Gwyn, III in Gaston County Superior Court. Heard in the Court of

 Appeals 14 April 2021.

 Attorney General Joshua H. Stein, by Assistant Attorney General Rebecca E.
 Lem, for the State.

 Mark Montgomery for defendant-appellant.

 TYSON, Judge.

¶1 Scott Warren Flow (“Defendant”) appeals from judgments entered upon a

 jury’s verdict. We find no error.

 I. Background

¶2 Defendant met “Hannah” in the spring of 2017, and they began a romantic, but

 non-sexual, relationship (pseudonym used to protect complainant’s identity). Around

 Thanksgiving of 2017, Defendant and Hannah were waiting inside a vehicle in a
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 parking lot to pick up Hannah’s daughter, Brooklin, when she got off of work. While

 in the car, Defendant became agitated as Hannah was texting her niece.

¶3 After Brooklin entered the car, Defendant “sped[] off . . . [was] cussing, and got

 mad.” Brooklin tried to calm Defendant during the drive to Hannah’s house. After

 Defendant pulled the car into the carport, he began “cussing and raging.”

¶4 Hannah’s house was decorated for Christmas. Defendant took Christmas

 presents from under the tree and threw them across the house. Defendant left the

 house. Hannah ended their relationship. Defendant was upset and responded

 Hannah “would regret ever having known him.”

¶5 On Christmas Day 2017, Hannah, Brooklin, and Brooklin’s boyfriend

 discovered both of Hannah’s car tires on the right side were flat. Hannah was

 alarmed and sought and received a Domestic Violence Protective Order (“DVPO”)

 against Defendant in February 2018 under N.C. Gen. Stat. § 50B-1(b)(6) (2019).

¶6 Hannah’s mother was hospitalized after Christmas 2017 with double

 pneumonia. Hannah was visiting her mother at the hospital. Defendant came into

 Hannah’s mother’s room at the hospital. Hannah tried to avoid him by leaving the

 room. Defendant sought to speak with Hannah in the waiting room of the hospital.

 Hannah told Defendant she could not speak with him because of the DVPO.

 Defendant apologized to Hannah for his actions. Defendant and Hannah then spoke

 for about twenty minutes.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

¶7 Hannah and Defendant began communication via text messaging and

 telephone. Defendant admitted to and apologized for puncturing Hannah’s tires.

 Hannah and Defendant began seeing each other again in person.

¶8 On 26 May 2018, Hannah picked up Brooklin to go shopping. While they were

 in the car, Defendant called Hannah screaming: “I’m being shot at, I’m being shot

 at[.]” Hannah called Defendant back. Defendant stated he was with his friend,

 Johnny Max, at Max’s house. Max’s father or father-in law had started shooting at

 him.

¶9 While Hannah and Brooklin were in a store, Defendant called Hannah on

 Facetime video from the front porch of Hannah’s niece, Christine’s, house. Defendant

 said he was hiding from law enforcement officers because of the incident at Max’s

 house. Defendant believed 911 had been called with a description of his car. Hannah

 asked Defendant to leave Christine’s house.

¶ 10 Defendant again called Hannah, reporting he was “going to kill a ni--er.”

 Hannah believed Defendant may harm her older daughter’s, boyfriend, who was

 black. Hannah left Brooklin at her house babysitting Hannah’s two grandchildren,

 Armoni and Daeja. Hannah drove to her other daughter’s house. Defendant was not

 there.

¶ 11 Brooklin and Armoni were in the kitchen around 7:30 p.m. Brooklin heard a

 car pulling into the driveway. Daeja was in her crib upstairs. Brooklin recognized
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 Defendant and told Armoni to go upstairs. Brooklin locked the door and went to make

 sure Armoni had hidden herself. Brooklin went to the laundry room to look outside.

¶ 12 Brooklin observed Defendant get out of his car and approach the back door.

 Defendant banged on the door with his fist, then began kicking the door. Brooklin

 heard the door crack, saw Defendant walking from the living room, down the hallway,

 and into Hannah’s bedroom. Brooklin called out to Defendant to ask what he was

 doing. Defendant did not respond. Brooklin could hear Defendant rummaging

 through Hannah’s dressers. Brooklin saw Defendant come out of Hannah’s bedroom

 with her mother’s two guns.

¶ 13 Defendant approached Brooklin yelling for her to call her mother. Defendant

 demanded to know why Hannah was not answering his calls and ignoring him.

 Brooklin responded she did not know Hannah was ignoring him and Defendant was

 scaring her. Brooklin was too afraid to call 911. Brooklin called and texted Hannah

 but received no response. Brooklin contacted her neighbor, Brittany Brady, who told

 her to get Armoni and Daeja out of the house.

¶ 14 Around this time, Hannah arrived home. Hannah saw Defendant’s car in the

 driveway, and observed the French doors in the back of the house were open. Brooklin

 was behind the door. Hannah brushed by Defendant to get Daeja from her crib and

 then got Armoni. Brady arrived and took Daeja, Armoni, and Brooklin from the

 house.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

¶ 15 Once Brooklin and her grandchildren were gone, Defendant began to drag

 Hannah upstairs toward her bedroom. Once both were inside the bedroom,

 Defendant pushed Hannah onto the floor, commanding, “Bitch, get on the floor.”

 After Hannah was on the floor, Defendant walked over and put the gun to the back

 of her head. He told Hannah she was taking her last breath, because he was going

 to “blow her brains out.”

¶ 16 Defendant grabbed Hannah by her hair, pulled her up to her knees, and shoved

 her into the bathroom. Defendant entered the bathroom and locked the door.

 Defendant grabbed Hannah by the neck, placed a gun to her temple, and said, “You

 used me, didn’t you, bitch, you used me.” and “You better tell me what I want to hear

 or I’ll blow your brains out.” Defendant then put the gun to her eye socket and again

 threatened to “blow [her] brains out.” Hannah begged Defendant for her life.

¶ 17 Defendant had Hannah sit on the floor and not move her hands. Defendant

 smoked a cigarette and cracked open the bathroom door. Defendant told Hannah “It

 wasn’t supposed to end like this, you were supposed to come to South Carolina, I was

 gonna kill my daddy and then you and then myself.”

¶ 18 Defendant saw police vehicles’ blue lights outside. The lights alarmed

 Defendant, who grabbed Hannah and put his arm around her throat. Defendant told

 Hannah to call 911, demanding for the police officers to turn off their blue lights, or

 he was going to “blow her brains out.” When Hannah tried to get her hair out of her
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 face, Defendant hit her in the face with the butt of the gun.

¶ 19 Hannah called 911. Defendant told Hannah he was not worried about what

 was going to happen to him, Gaston County was an “easy” county, and the State of

 North Carolina does not have “hard rules.” Defendant hit Hannah’s head against the

 bathroom sink a couple of times. Defendant hit Hannah in the mouth and told her to

 “stop her damn crying,” he “didn’t want to hear that whiny mess.”

¶ 20 Defendant made Hannah straddle the toilet and remove his penis from his

 pants. Defendant urinated on Hannah then made her put his penis back into his

 pants. Hannah attempted to wipe Defendant’s urine off of her. Defendant grabbed

 Hannah’s pants and told her to remove them. Hannah initially refused, but she took

 off her pants and shirt after Defendant threatened to blow her kneecaps off.

¶ 21 Defendant removed his own pants and positioned himself behind Hannah.

 Defendant unsuccessfully attempted to insert his penis in Hannah’s rectum. Hannah

 told Defendant he was hurting her and to stop. Defendant attempted but was unable

 to penetrate Hannah’s vagina with his penis. He dragged Hannah out of the bathroom

 into the bedroom.

¶ 22 Inside the bedroom, Defendant ordered Hannah to get onto her knees.

 Defendant positioned himself behind Hannah, placed a gun to the back of her head,

 and inserted his penis into her vagina. Defendant made Hannah turn over onto her

 back and again inserted his penis into her vagina.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

¶ 23 While these events were unfolding, Gaston County police officers were

 attempting to contact Hannah. Defendant got off Hannah, told her to lie across the

 bed and to “suck his penis.” Defendant grabbed Hannah by her hair, inserted his

 penis into her mouth, and moved her head up and down. Hannah told Defendant she

 did not want her children to see her like this and begged to be allowed to put her

 clothes back on.

¶ 24 Defendant intermittently allowed Hannah to answer her cell phone and speak

 with police. The officers asked Defendant to release Hannah. When Defendant said

 he was thirsty, Hannah offered to go get him water. Defendant put his arm around

 Hannah’s neck, put a gun to her temple, and made Hannah walk in front of him as a

 shield while getting water.

¶ 25 As Defendant and Hannah entered the living room, Defendant became

 agitated and pulled Hannah backwards into a bathroom. Defendant shut and locked

 the door. Defendant spoke with police on Hannah’s phone. Defendant ordered

 Hannah to call her pastor and her pastor’s wife, but neither answered Hannah’s call.

 Hannah’s pastor’s wife returned her call, and Defendant told Hannah to talk to her

 now while she could.

¶ 26 Defendant then grabbed Hannah by her arm and led her back into the

 bedroom. Defendant locked the bedroom door. Defendant told Hannah to take her

 clothes off and used his free hand, while holding the gun on her with the other, to pull
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 her clothes off of her. Defendant got on top of Hannah and again inserted his penis

 into her vagina. With a gun in his hand, Defendant instructed Hannah to get on top

 of him and again inserted his penis into her vagina. Defendant instructed Hannah

 to move, but she was unable to make herself move. Defendant allowed Hannah to

 get off of him, and he got behind her and re-inserted his penis in her vagina. When

 Defendant finished, he stood up and allowed Hannah to put her pants and shirt on.

¶ 27 Hannah had her cell phone on speaker with police officers. Defendant used his

 cell phone to call his uncle, Ronnie Moore, but the call went to voicemail. Defendant

 was able to reach Moore’s daughter, Jennifer, and told her, “ I wished you could come

 get me but I’ve done something really bad this time, you can’t come pick me up.”

 Hannah told police on her phone Defendant was threatening to kill her.

¶ 28 When Defendant’s phone went dead, Defendant looked over at Hannah and

 said, “It’s time.” Hannah responded, “what do you mean it’s time[?]” Defendant said,

 “I’m gonna kill you and I’m gonna kill myself.” Defendant reached up and grabbed

 Hannah by her neck with his arm, and he pulled her down toward him. Defendant

 said he was going to blow her brains out. Hannah began to scream and tried to get

 away. Hannah got to the edge of the bed when she heard a loud noise.

¶ 29 Gaston County police officers had initiated an emergency rescue of Hannah.

 When the emergency response team reached the back bedroom, they observed

 Hannah on the floor between Defendant’s legs. Defendant had his arm around her
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 neck and was holding a gun to her head. The emergency response team was able to

 subdue Defendant in handcuffs and grab Hannah, pulling her out of the room to

 safety. Police recovered two revolvers at the scene.

¶ 30 Hannah was transported to the hospital, where medical professionals took

 Hannah’s medical history and a description of the assault. Hospital staff took

 photographs of Hannah’s injuries; conducted a physical exam; and took swabs of her

 fingernails, mouth, vaginal, and genital areas. The anal swab, vagina swabs, and

 genital swabs contained Defendant’s DNA profile.

¶ 31 Defendant was indicted for possession of a firearm by a felon, four counts of

 first-degree kidnapping, burglary, DVPO violation with a deadly weapon, two counts

 of first-degree rape, and first-degree forcible sex offense. Defendant’s charges were

 joined for trial beginning on 9 December 2019. Defendant was present in court for

 voir dire, opening statements, the testimony of all witnesses, and the closing

 arguments to the jury from both sides.

¶ 32 The morning of the sixth day of the trial before the jury was to be charged,

 Defendant was being escorted from the Gaston County Jail. At some point,

 Defendant indicated he had forgotten his glasses in his cell and asked if he could go

 and get them. Defendant was standing over the ledge of the second-floor mezzanine.

 Detention officers reported to the second-floor mezzanine after being told Defendant

 was “hanging” on the second-floor mezzanine approximately sixteen feet off of the
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 ground. Detention officers told Defendant not to jump, but Defendant jumped feet

 first. Defendant fell onto a metal table and landed on the ground. Defendant suffered

 injuries to his left leg and ribs. Defendant was transported to the hospital and

 underwent surgery to reduce a fracture in his femur.

¶ 33 The trial court conducted a hearing to determine whether Defendant’s absence

 from trial was voluntary. The trial court considered and denied Defendant’s counsel’s

 motion for the court to make further inquiry into his capacity to proceed.

¶ 34 The trial court ruled Defendant had voluntarily absented himself from the

 proceedings, and the trial would continue without Defendant present. The jury

 charge, jury deliberations, and sentencing commenced without Defendant present in

 the courtroom. Defendant’s counsel objected to each phase proceeding outside of

 Defendant’s presence.

¶ 35 The jury returned verdicts and found Defendant guilty of two counts of first-

 degree forcible rape, first-degree kidnapping, first-degree forcible sexual offense,

 second degree burglary, false imprisonment, possession of a firearm by a convicted

 felon, and DVPO violation with a deadly weapon.

¶ 36 Defendant was sentenced to consecutive sentences of 276 to 392 months for the

 first-degree forcible sexual offense, and two sentences of 276 to 392 for each first-

 degree forcible rape. Defendant’s convictions for first-degree kidnapping, second

 degree burglary, DVPO violation with a deadly weapon, possession of a firearm by a
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 felon, and false imprisonment were consolidated for judgment. Defendant was

 sentenced to 180 to 228 months to run consecutive to his other consecutive sentences.

 Defendant was ordered to register as a sex offender for the remainder of his natural

 life. Defendant’s counsel gave oral notice of appeal in open court.

 II. Jurisdiction

¶ 37 This Court possesses jurisdiction pursuant to N.C. Gen. Stat. §§ 7A-27(b) and

 15A-1444(a) (2019).

 III. Issues

¶ 38 Defendant argues the trial court erred by denying Defendant’s counsel’s

 motion to conduct an inquiry into his capacity to proceed. Defendant also argues the

 court’s instructions on first-degree sexual offense deprived Defendant of his right to

 a unanimous jury verdict.

 IV. Capacity to Proceed

¶ 39 Defendant argues the trial court erred in denying the defense’s motion for an

 inquiry into Defendant’s capacity to proceed.

 A. Standard of Review

¶ 40 “The standard of review for alleged violations of constitutional rights is de

 novo.” State v. Anderson, 222 N.C. App. 138, 142, 730 S.E.2d 262, 265 (2012).

 B. Necessity of Hearing

¶ 41 Our Supreme Court recently reviewed this issue. When a defendant’s capacity
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 to proceed is questioned, the court must determine whether a hearing is necessary.

 The court must decide “whether there was substantial evidence before the trial court

 as to [the defendant’s] lack of capacity to truly make such a voluntary decision.” State

 v. Sides, 376 N.C. 449, 459, 852 S.E.2d 170, 177 (2020). “[T]he decision whether to

 grant a motion for commitment for psychiatric examination to determine competency

 to stand trial lies within the sound discretion of the trial judge.” State v. Williams,

 38 N.C. App. 183, 189, 247 S.E.2d 620, 623 (1978). “The method of inquiry [is] within

 the discretion of the trial judge, the only requirement being that defendant be

 accorded due process of law.” State v. Gates, 65 N.C. App. 277, 281, 309 S.E.2d 498,

 501 (1983).

¶ 42 Criminal defendants possess the constitutional right to be present at all stages

 of their trial. See Kentucky v. Stincer, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 647 (1987).

 However, where the offense is non-capital, the Supreme Court has held a defendant

 may waive that right where they “voluntarily absent” themselves. See Taylor v.

 United States, 414 U.S. 17, 19, 38 L. Ed. 2d 174, 177 (1973).

¶ 43 Our Supreme Court has recognized a “trial court has a constitutional duty to

 institute, sua sponte (sic), a competency hearing if there is substantial evidence

 before the court indicating that the accused may be mentally incompetent.” State v.

 Young, 291 N.C. 562, 568, 231 S.E.2d 577, 581 (1977); see also N.C. Gen. Stat. § 15A-

 1002 (2019).
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

¶ 44 When evaluating whether a sua sponte competency hearing is necessary, a trial

 judge must conduct a fact-intensive inquiry. Sides, 376 N.C. at 466, 852 S.E.2d at

 181–82. Previously, courts have considered a defendant’s answers to the trial court’s

 questions and whether their responses were “lucid and responsive” to demonstrate

 and support a defendant’s competence. State v. Staten, 172 N.C. App. 673, 680, 616

 S.E.2d 650, 655 (2005). Additionally, “[e]vidence of a defendant’s irrational behavior,

 his demeanor at trial, and any prior medical opinion on competence to stand trial are

 all relevant” to an inquiry regarding a defendant’s competency. State v. McRae, 139

 N.C. App. 387, 390, 533 S.E.2d 557, 559 (2000).

¶ 45 In Sides, the Supreme Court reviewed a defendant’s appeal, who was charged

 with four counts of felony embezzlement. After the first three days of trial, the

 defendant intentionally ingested sixty Xanax tablets. Sides, 376 N.C. at 450, 852

 S.E.2d at 172. A doctor evaluated the defendant and recommended she be

 involuntarily committed. He checked the box on the petition form describing her as

 “mentally ill and dangerous to self or others or mentally ill and in need of treatment

 in order to prevent further disability or deterioration that would predictably result in

 dangerousness.” Id.

¶ 46 A magistrate found reasonable grounds to believe the defendant required

 involuntary commitment, and she began a period of commitment. Id. at 451, 852

 S.E.2d at 172. A psychiatrist evaluated her the next day, and noted the defendant
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 remained suicidal and required inpatient stabilization. Id.

¶ 47 Our Supreme Court held the trial court erred by presuming the defendant’s

 suicide attempt was a voluntary waiver of her right to be present at the trial.

 Pursuant to her attempt, the trial court sought information on whether the absence

 was voluntary or involuntary. Id. at 451, 852 S.E.2d at 173. The trial court recessed

 the proceedings after reviewing draft orders from the State. Id. at 452, 852 S.E.2d at

 173.

¶ 48 The trial court intended to wait until the following Monday, when the

 defendant would be released, or the trial court would have access to her medical

 records. Id. at 452-53, 852 S.E.2d at 173-74. Proceedings resumed on the following

 Monday, while the defendant remained in the hospital. Id. at 453, 852 S.E.2d at 174.

 The trial court read the defendant’s medical records, which included the

 recommendation from doctors that she remain hospitalized, as well as information

 about her history of a mood disorder and her prescriptions: Haldol for agitation,

 Vistaril for anxiety, Trazodone to help her sleep, and 100 milligrams of Zoloft daily.

 Further, the trial court confirmed with defense counsel that neither the court nor

 counsel had observed anything indicating the defendant lacked competency to

 proceed at trial. Id. at 453-54, 852 S.E.2d at 174. The trial court ruled defendant

 “voluntarily by her own actions made herself absent from the trial” over defense

 counsel’s objection. Id. at 454-455, 852 S.E.2d at 174.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

¶ 49 The Court held that while a defendant may voluntarily waive the

 constitutional right to be present at trial, the defendant may only waive the right

 when they are competent. Id. at 456, 852 S.E.2d at 175. The Supreme Court

 concluded the trial court had erred “by essentially skipping over the issue of

 competency and simply [pre]summing . . . defendant’s suicide attempt was a

 voluntary act that constituted a waiver of her right to be present during her trial,

 [and] both the majority at the Court of Appeals and the trial court ‘put the cart before

 the horse.’” Id. at 456-57, 852 S.E.2d at 176.

¶ 50 “Once the trial court had substantial evidence that defendant may have been

 incompetent, it should have sua sponte (sic) conducted a competency hearing to

 determine whether she had the capacity to voluntarily waive her right to be present

 during the remainder of her trial.” Id. at 457, 852 S.E.2d at 176 (emphasis supplied).

¶ 51 Our Supreme Court held:

 In such cases, the issue is whether the trial court is
 required to conduct a competency hearing before
 proceeding to determine whether the defendant made a
 voluntary waiver of her right to be present, or,
 alternatively, whether it is permissible for the trial court
 to forego a competency hearing and instead assume a
 voluntary waiver of the right to be present on the theory
 that the defendant’s absence was the result of an
 intentional act.

 Id. at 456, 852 S.E.2d at 175–76.

¶ 52 Our Supreme Court further held:
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 [T]he issue of whether substantial evidence of a
 defendant’s lack of capacity exists so as to require a sua
 sponte (sic) competency hearing requires a fact-intensive
 inquiry that will hinge on the unique circumstances
 presented in each case. Our holding should not be
 interpreted as a bright-line rule that a defendant’s suicide
 attempt automatically triggers the need for a competency
 hearing in every instance. Rather, our decision is based on
 our consideration of all the evidence in the record when
 viewed in its totality.

 Id. at 466, 852 S.E.2d at 182 (emphasis supplied).

¶ 53 During Defendant’s trial, the trial court did not have a detailed mental health

 history nor was substantial evidence presented or any prior notice or actions tending

 to show Defendant may have been incompetent. In Sides, the court was provided

 with a large amount of evidence and history, including physicians’ diagnoses and

 recommendations concerning the defendant’s documented mental health concerns.

 The trial court was informed the defendant had “a number of medical conditions by

 her and her family” and defense counsel offered to obtain more information from her

 doctors. Id. at 451, 852 S.E.2d at 173.

¶ 54 Because nothing in Defendant’s prior record, conduct, or actions provided the

 trial court with notice or evidence Defendant may have been incompetent, the court

 did not err by declining to conduct a more intensive hearing on Defendant’s capacity

 to proceed. The trial court had the opportunity to personally observe Defendant’s

 conduct and demeanor, heard arguments from both the State and defense counsel,
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 and took evidence concerning Defendant’s competency.

¶ 55 The State argued Defendant had answered questions appropriately and clearly

 and was able to participate in trial and confer and communicate with counsel. The

 State also argued Defendant’s decision to harm himself had no bearing on whether

 he possessed the mental capacity to assist in his own defense. Defense counsel

 challenged his client’s competency under N.C. Gen. Stat. § 15A-1002 and stated

 jumping sixteen feet from the second-floor mezzanine may have been a suicide

 attempt.

¶ 56 Also, without the jury present, the trial court heard testimony from Shana

 Withers, a public defender investigator, who testified about her visit with Defendant

 at the hospital where he was being treated.

¶ 57 Additionally, the trial court heard from a jailhouse deputy, Darrell Griffin, who

 was present when Defendant jumped from the second-floor mezzanine. He testified

 Defendant had not previously demonstrated prior episodes of mental or emotional

 disturbance and described the scene when Defendant jumped from the second-story

 mezzanine. After hearing the testimony of Withers, Officer Griffin and viewing

 recorded footage of Defendant dropping from the mezzanine, the trial court found

 Defendant had voluntarily absented himself from the proceedings.

¶ 58 This Court has stated, “a trial judge is required to hold a competency hearing

 when there is a bona fide doubt as to the defendant’s competency even absent a
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 request.” Staten, 172 N.C. App. at 678, 616 S.E.2d at 654-55 (citation omitted).

 “Failure of the trial court to protect a defendant’s right not to be tried or convicted

 while mentally incompetent deprives him of his due process right to a fair trial.” State

 v. McRae, 139 N.C. App. 387, 389, 533 S.E.2d 557, 559 (2000) (citations omitted).

 “Evidence of a defendant’s irrational behavior, his demeanor at trial, and any prior

 medical opinion on competence to stand trial are all relevant to a bona fide doubt

 inquiry.” Id. at 390, 533 S.E.2d at 559 (citation and quotation marks omitted).

¶ 59 Here, and unlike the facts in Sides, Defendant engaged in two lengthy

 colloquies with the trial court and later waived his right not to testify. These

 colloquies lead to this Court’s analysis in State v. Staten.

¶ 60 In Staten, the defendant wanted to testify on his own behalf. Staten, 172 N.C.

 App. at 679, 616 S.E.2d at 655. The trial court conducted the following colloquy to

 determine the voluntariness of the defendant’s testimony and his understanding of

 possible outcomes:

 [The Court]: All right. Mr. Staten, you have talked to your
 attorney concerning the question of whether or not you
 should testify or not in this case?

 [Defendant]: Yes Sir.

 [The Court]: And you understand that if you do testify the
 State can ask you a lot of questions on cross-examination
 about your prior record and things of that nature?

 [Defendant]: Yes sir.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 [The Court]: And you understand that may sway the jury
 somewhat? Sometimes it does. And it could be that it
 doesn’t work out to your advantage.

 [Defendant]: Yes sir.

 [The Court]: Are you telling me now that even though you
 understand the consequences of your decision to testify you
 still want to go through with it?

 [Defendant]: I want to testify and tell everybody like came
 [sic] behind me and testified after I already testified and
 say something about me and I want to testify again to clear
 up what they have said like we did the last time.

 Id. at 679-80, 616 S.E.2d at 655.

¶ 61 The Court found “the defendant’s replies were lucid and responsive,

 demonstrating his desire to testify and displaying his understanding of the

 consequences of doing so.” Id. at 680, 616 S.E.2d at 655. These factors demonstrated

 the defendant was competent to stand trial. Id.

¶ 62 Here, two similar colloquies between the trial court and Defendant occurred.

 The trial court inquired about Defendant’s voluntariness to testify on his own behalf.

 THE COURT: [Defendant], have you been able to go over
 with your attorneys your choice of whether or not to testify?

 THE DEFENDANT: Yes, Your honor.

 THE COURT: Just answer yes or no. You have?

 THE DEFENDANT: Yes.

 THE COURT: And have they answered all your questions
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

about that?

THE DEFENDANT: Yes, sir.

THE COURT: And how are you feeling today? Is your mind
clear?

THE DEFENDANT: Yes.

THE COURT: Are you taking any kind of medicines or any
kind of substances at all that would affect how you think
or feel?

THE DEFENDANT: No, sir.

THE COURT: So your mind is clear as we have this
conversation?

THE DEFENDANT: Correct, yes, sir.

THE COURT: And you realize you have the right not to
testify?

THE DEFENDANT: Yes, sir.

THE COURT: Do you also realize, as a result of your
conversation with the attorneys, that you have the right to
testify?

THE DEFENDANT: Yes, sir.

THE COURT: You have both of those rights.

THE DEFENDANT: Right.

THE COURT: And you understand that at this juncture, at
this point in the trial, it is your decision entirely as to
whether or not you decide to testify or not. Do you
understand that?

THE DEFENDANT: Yes.
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 THE COURT: It is not your lawyer’s decision, it’s not the
 DA’s decision, it’s not my decision, it’s your decision and
 your decision alone. So have you been able to think some
 this afternoon about whether or not you want to testify?

 THE DEFENDANT: Yes, sir, I have.

 THE COURT: And what is your decision?

 THE DEFENDANT: I’m not going to testify.

¶ 63 The following Monday, after the weekend recess, the trial court conducted

 another colloquy with Defendant to determine whether he had changed his mind over

 the weekend. Like the exchanges in Staten, these colloquies and Defendant’s answers

 to the trial court’s questions also demonstrate and support presumption and the trial

 court’s conclusion of Defendant’s competence. Defendant engaged in lengthy

 colloquies with the trial court, Defendant’s responses were “lucid and responsive.” Id.

¶ 64 Here, unlike in Sides, the trial court heard and considered the evidence

 necessary to determine Defendant’s competency, no substantial evidence tends to

 show or support a finding Defendant may have been incompetent. The trial court

 was not required to hold an additional sua sponte competency hearing. The court had

 conducted the appropriate fact-intensive inquiry and found and concluded Defendant

 had voluntarily waived his right to be present at trial.

¶ 65 The trial court considered the facts that Defendant did not display any

 inappropriate conduct at trial, nor that Defendant had a prior medical history, which

 raised any question of his competence. The trial court did not err in denying the
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 defense motion for further inquiry into Defendant’s capacity. Defendant’s argument

 is without merit and is overruled. Sides, 376 N.C. at 466, 852 S.E.2d at 181–82.

 V. Jury Instruction

¶ 66 Defendant argues the trial court’s jury instruction on sexual offense deprived

 Defendant of his right to a unanimous jury verdict. The trial court’s instruction

 states, inter alia:

 A sexual act means either cunnilingus, which is any
 touching, however slight, by the lips or tongue of one
 person to any part of the female sex organ of another.
 Fellatio, which is any touching by the lips or tongue of one
 person and the male sex organ of another. Anal
 intercourse, which is any penetration, however slight, of
 the anus of any person by the male sex organ of another.
 Or any penetration, however slight, by an object into the
 genital or anal opening of a person’s body.

¶ 67 The trial court instructed the jury it could find Defendant guilty of a first-

 degree sexual offense, if, in addition to the other required elements it found

 Defendant had engaged in fellatio or anal intercourse. These are not disparate

 crimes, but are “merely alternative ways of showing the commission of a sexual act.”

 State v. Petty, 132 N.C. App. 453, 463, 512 S.E.2d 428, 434-35 (1999).

¶ 68 The unchallenged evidence from Hannah’s testimony meets the statutory

 requirements of N.C. Gen. Stat. §14-27.26 (2019). Our Supreme Court and our Court

 have consistently held a jury verdict does not need to make a specific finding

 regarding precisely which sexual acts proscribed by N.C. Gen. Stat. § 14-27.26
 STATE V. FLOW

 2021-NCCOA-183

 Opinion of the Court

 defendant committed. See State v. Hartness, 326 N.C. 561, 391 S.E.2d 177 (1990);

 State v. McCarthy, 326 N.C. 782, 392 N.C. 359 (1990); State v. Petty, 132 N.C. App.

 453, 512 S.E.2d 428 (1999). We are bound by our Supreme Court’s and this Court’s

 prior precedents. See In re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989).

 Defendant’s argument is overruled.

 VI. Conclusion

¶ 69 The trial court properly denied Defendant’s counsel’s motion to conduct an

 additional inquiry into his capacity to proceed following his intentional act to injure

 himself, to voluntarily absent himself from trial. The trial court’s jury instruction on

 first-degree sexual offense, which can be committed by multiple acts, did not deprive

 Defendant of his right to a unanimous jury verdict.

¶ 70 If Defendant required greater specificity, he could have moved for a bill of

 particulars under N.C. Gen. Stat. § 15A-925 (2019) and/or for a special verdict sheet

 under N.C. Gen. Stat. § 15A-1340.16 (2019).

¶ 71 Defendant received a fair trial, free from prejudicial errors he preserved and

 argued. We find no error in the jury’s verdicts or the judgments entered thereon. It

 is so ordered.

 NO ERROR.

 Judges COLLINS and CARPENTER concur.